**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| STS RENEWABLES LTD., et al.,[1] | Case No. 25-10884 |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**DECLARATION OF FOREIGN REPRESENTATIVE PURSUANT TO 11 U.S.C. § 1515 AND RULE 1007(a)(4) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IN SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Matthew Tokarik, to the best of my information and belief, state as follows:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise. I am making this declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. I am a director of STS Renewables Ltd. (the "Foreign Representative" or "STS Renewables"), which wholly-owns, directly or indirectly, Earth Drilling Co. Ltd. ("Earth Drilling Canada"), On Track Drilling Inc. ("On Track"), Subterra Capital Partners Inc. ("SCPI"), Subterra Development Ltd. ("Subterra Development"), Earth Drilling Co. Ltd. ("Earth Drilling US"), STS Renewables Earth USA Acquisition Co. Ltd. ("STS US"), Harris Exploration Drilling &

[1] The Debtors in these chapter 15 cases (the "Chapter 15 Cases"), along with the last four digits of each Debtor's unique identifier, are: STS Renewables Ltd. (6458); Earth Drilling Co. Ltd. (2067); On Track Drilling Inc. (0775); Subterra Capital Partners Inc. (1618); Subterra Development Ltd. (8868); Earth Drilling Co. Ltd. (5471); STS Renewables Earth USA Acquisition Co. Ltd. (9095); Harris Exploration Drilling & Associates Inc. (9416); and Subterra Capital Partners US Inc. (0344). The Debtors' service address for purposes of these Chapter 15 Cases is 365 Bloor St. E, Suite 400, Toronto, Ontario, Canada M4W 1H7.

Associates Inc. ("Harris Exploration"), and Subterra Capital Partners US Inc. ("SCPI US," and collectively, the "Debtors"). I am also a director of each of the Debtors and President of SCPI, and thus familiar with the Debtors, whose insolvency proceedings (the "CCAA Proceedings") are currently proceeding in Ontario, Canada pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36, as amended (the "CCAA").

3. I submit this declaration in support of: (a) the official form chapter 15 petitions for the Debtors (the "Voluntary Petitions"); (b) the *Verified Petition for (I) Recognition of Foreign Main Proceedings; (II) Recognition of Foreign Representative; and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition"); (c) the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion"); (d) the *Motion for Order (I) Directing Joint Administration of Cases Under Chapter 15 of the Bankruptcy Code; (II) Authorizing Foreign Representative to File Consolidated Lists of Information Required by Bankruptcy Rule 1007(a)(4); and (III) Authorizing Redaction of Certain Personal Identifying Information Within the Consolidated Lists* (the "Joint Administration Motion"); and (e) the *Motion for Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* (the "Notice Procedures Motion").

## I. DEBTORS' BUSINESS OPERATIONS

4. The Debtors are a vertically integrated geothermal energy system developer that provides renewable heating and cooling to multi-residential building developers. The Debtors' business is controlled by STS Renewables, a private Canadian corporation that wholly-owns, directly or indirectly, each of the other Debtors (each a "Subsidiary" and collectively the "Subsidiaries"). The Debtors operate two complementary business segments that primarily operate

in the geothermal industry: (i) a business segment focused on utility development (the "Utility Development Business"), through which the Debtors, in partnership with Forum (defined below), utilize an "energy-as-a-service"("EaaS") business model, and (ii) a business segment focused on geothermal, geotechnical, oil sands, and mineral exploration drilling (the "Drilling Business", and together with the Utility Development Business, the "Business"), through which it specializes in the drilling required to install geothermal energy systems. The Debtors work with public institutions, energy companies, real estate developers, and other businesses across Canada and the United States of America.

5. As of the Petition Date, the Debtors have leases for a corporate head office in Toronto, Ontario (the "Corporate Head Office"), a head office and shop for Earth Drilling Canada's drilling business in Calgary, Alberta (the "Calgary Facility"), a head office and shop for On Track in Langley, British Columbia (the "Langley Facility"), a satellite office and shop for Earth Drilling Canada's geothermal business in North York, Ontario (the "North York Facility"), and an office and shop for Harris Exploration's drilling business in Fallon, Nevada (the "Fallon Facility").

**A. Utility Development Business**

6. The Business originally began with the incorporation of Debtor SCPI in December 2017, which focused solely on the Utility Development Business. Realizing that SCPI's business model was capital intensive and required significant upfront investment, SCPI sought a capital partner to provide the funding necessary to undertake these projects. In May 2019, SCPI began its partnership with Forum Investment and Development Corporation ("Forum"), and the Utility Development Business evolved to operate as part of a joint venture (the "Forum-Subterra JV") between Forum and SCPI. The Forum-Subterra JV is and/or has been governed by (i) a limited partnership agreement; (ii) a master funding agreement (the "Master Funding Agreement"), which

terminated (although certain limited obligations of both parties survive thereunder); and (iii) a management services agreement, each of which have been amended and restated from time to time (collectively, the "Partnership Documents").

7. Pursuant to the Partnership Documents, SCPI identifies potential customers and provides utility development services for customers on behalf of the partnership, while Forum, through an affiliate, provides equity funding for the utility development projects through various corporate entities and special purpose limited partnerships (or related general partners) (collectively, the "Non-Applicant Stay Parties"). The Non-Applicant Stay Parties are not petitioners in the CCAA Proceedings or Debtors in these Chapter 15 Cases.

8. Revenues generated by the Utility Development Business accrue to the Non-Applicant Stay Parties and then are distributed between Forum and SCPI pursuant to the Partnership Documents. More specifically, Non-Applicant Stay Party Forum Subterra Limited Partnership ("FSLP"), directly or through owned special purpose entities, is the contracting party with various entities across Canada to which it provides geothermal energy services pursuant to geothermal energy supply agreements ("GESAs"). Upon reaching certain thresholds of net cash flow generated under the GESAs, the funds are distributed between Forum and SCPI in accordance with the Partnership Documents.

9. Collectively, the Non-Applicant Stay Parties are party to fifty-four (54) GESAs—forty-five (45) are in the development, preconstruction, or construction phase and nine (9) are in the operational phase. SCPI has identified several other properties across Canada for which a GESA could be entered in the near term, and as discussed further below, through SCPI US, the Debtors are in the preliminary stages of expanding the Utility Development Business to the United States.

**B. The Drilling Business and Expansion to the United States**

10. As the Utility Development Business has grown in Canada, the Debtors have completed various acquisitions to: (i) enter the Drilling Business, allowing the Debtors to offer vertically integrated geothermal services; and (ii) expand the Business into the United States. Through a series of transactions, including the acquisition of Earth Drilling Canada in August 2023 (the "Earth Drilling Acquisition"), the Debtors now have a substantial fleet of drilling equipment and the ability to offer significant drilling capabilities to customers.

11. Earth Drilling Canada, On Track, and Harris Exploration (together, the "Drilling Companies") collectively own approximately 44 drill rigs and own and lease a significant amount of other heavy equipment. SCPI engages certain of the Drilling Companies in connection with the construction and development of geothermal systems of the Utility Development Business. The Drilling Companies also provide drilling services—such as servicing oil and gas markets and exploration drilling—to entities outside of the Utility Development Business. The Drilling Companies employ the vast majority of the Debtors' approximately 105 employees (as of April 15, 2025).[2] Earth Drilling Canada employs 73 employees, On Track employs 7 employees, and Harris Exploration employs 16 employees. SCPI employs the remaining 9 employees.

12. Additionally, the Debtors have expanded their business segments in the United States through the acquisition of Harris Exploration on the Drilling Business side, and the launch of SCPI US to offer utility development services to US-based customers on the Utility Business Development side. SCPI US has entered into contracts with two potential customers but does not currently have a capital partner or any projects underway.

---

[2] The number of individuals employed by the Debtors can vary materially depending on the number of operational projects that the Debtors are involved in.

13. Harris Exploration employs the Company's 16 US-based employees. Harris Exploration also holds licenses with state governments that allow it to conduct exploration drilling in Arizona, California, Nevada, and Utah.

## II. THE DEBTORS' CORPORATE STRUCTURE AND LEADERSHIP

14. STS Renewables, a privately held Canadian corporation,[3] is the ultimate parent company of each of the other eight Debtors. Of the eight, four are incorporated in Canada—Earth Drilling Canada, On Track, SCPI, and Subterra Development (together with STS Renewables, the "Canadian Debtors"); three are incorporated in Delaware—STS US, Earth Drilling US, and SCPI US; and one, Harris Exploration, is incorporated in California (together, STS US, Earth Drilling US, SCPI, and Harris Exploration, the "US Debtors").

15. STS Renewables centrally manages all corporate activities of the Subsidiaries from the Corporate Head Office in Toronto, Ontario. As of the Petition Date, the senior management of the Debtors are myself (a director of each of the Debtors and the President, Renewables of SCPI), Robert Corey Hawtin (Chief Executive Officer of STS Renewables), John Paul Wegleitner (President, Earth Drilling Canada), and Scott Jones (Senior Vice President, Construction and Development). I am primarily responsible for the direction of the Debtors' corporate, management, legal, investment, and strategic functions, all of which I manage from the Corporate Head Office.

16. Additionally, STS Renewables oversees the Debtors' two business segments: the Drilling Business and the Utility Development Business. Debtors Earth Drilling Canada, On Track, STS US, Earth Drilling US, and Harris Exploration are part of the Drilling Business, and debtors

[3] STS Renewables' equity is not publicly traded. As of the Petition Date, there are approximately 16 holders of STS Renewables' common stock

SCPI, SCPI US, and Subterra Development are part of the Utility Development Business.[4] The Debtors' and Non-Applicant Stay Parties' organizational chart is as follows:




17. As part of the Drilling Business, the Debtors have Canadian Subsidiaries and U.S. Subsidiaries. Earth Drilling Canada is a direct, wholly owned subsidiary of STS Renewables, and is itself the direct sole owner of On Track Canada. On the U.S. side, STS US is a direct, wholly owned subsidiary of STS Renewables, and is itself the direct sole owner of Earth Drilling US. Harris Exploration is a direct, wholly owned subsidiary of Earth Drilling US. Both STS US and Earth Drilling US are holding companies with no operations.

18. Like the Drilling Business, the Utility Development Business segment has Canadian Subsidiaries and U.S. Subsidiaries. SCPI is a direct, wholly owned subsidiary of STS Renewables, and is itself the direct, sole owner of Subterra Development. SCPI US is a direct,

---

[4] STS Renewables also wholly owns Turnkey Site Solutions Ltd. ("Turnkey"), a Canadian corporation. Turnkey is not a petitioner in the CCAA Proceedings or a debtor in these Chapter 15 Cases. On December 20, 2024, Turnkey filed an assignment in bankruptcy in Canada.

wholly owned subsidiary of STS Renewables. Currently, SCPI US does not carry out any operations.

## III. THE DEBTORS' CAPITAL STRUCTURE

19. The below summary of the Debtors' capital structure focuses on the components of the Debtors' capital structure that impact the US Debtors and excludes the components of the Debtors' capital structure that only pertain to the Canadian Debtors. A further explanation of the Debtors' Canadian capital structure is available in my Affidavit filed with the Ontario Superior Court of Justice (Commercial List).

### A. Secured Obligations[5]

#### 1. *Bank of Nova Scotia*

20. Bank of Nova Scotia ("BNS") is the Debtors' senior secured creditor pursuant to a loan agreement dated August 2, 2023 (as amended on December 14, 2023, the "Loan Agreement") between: (i) STS US, Turnkey, STS Renewables Earth Canada Acquisition Co. Ltd., and Subterra Construction Services Ltd. and the other borrower parties thereto from time to time as borrowers; (ii) SCPI, STS Renewables, and other guarantors party thereto from time to time as guarantors; (iii) BNS as lender; and (iv) certain parties that executed joinder agreements. After the acquisition of Earth Drilling, STS Renewables and all of the Subsidiaries, with the exception of Subterra Development and SCPI US, are either borrowers or guarantors under to the Loan Agreement (in such capacity, the "Loan Parties").

21. Pursuant to the Loan Agreement (as amended), BNS agreed to make the following credit facilities (the "BNS Facilities") available to certain of the Subsidiaries:

A. The Operating Facility, with a principal amount of not more than an aggregate

[5] The summaries provided herein are qualified in their entirety by the provisions of the relevant loan documents.

amount of CA$15 million advanced at any time, to be used for general corporate purposes and to finance working capital requirements in the ordinary course of business. The Operating Facility matures on August 2, 2025.

B. A non-revolving term loan (the "Earth Drilling Acquisition Loan"), with a principal amount of CA$15.017 million, made available to partially finance the Earth Drilling Acquisition. The Earth Drilling Acquisition Loan matures on August 2, 2025.

C. Certain uncommitted credit card facilities in the maximum principal amount of CA$1 million.[6]

22. To address liquidity issues facing the Applicants in October 2024 and into 2025, the Loan Parties requested certain increases to the principal amount that may be borrowed under the Operating Facility (the "Operating Facility Commitment"). Pursuant to agreements entered into between certain Loan Parties and BNS (among others) on October 2, 2024 (the "Continuance Agreement"), February 19, 2025 (the "A&R Continuance Agreement"), March 19, 2025 (the "Second A&R Continuance Agreement"), and May 6, 2025 (the "Third A&R Continuance Agreement", and collectively, the "Continuance Agreements"), BNS successively agreed to (among other things) increase the Operating Facility Commitment and to defer certain interest and principal payments. Pursuant to the Third A&R Continuance Agreement, the Operating Facility Commitment is now CA$20.1 million.

23. Subject to certain excluded collateral and permitted encumbrances, the Loan Parties' obligations under the BNS Facilities and Continuance Agreements are secured by a first

---

[6] Pursuant to the Loan Agreement (as amended), the credit facilities also include leasing facilities that may be entered into between BNS and the Loan Parties from time to time. The original iteration of the Loan Agreement also contemplated a non-revolving term loan to be made available to partially finance the acquisition of another company, which acquisition was ultimately not completed and which term loan was therefore never advanced.

priority security in substantially all of the Loan Parties' assets. As of May 8, 2025, approximately CA$41 million was owing to BNS across all of the BNS Facilities, consisting of CA$19 million under the Operating Facility, CA$13.6 million under the Earth Drilling Loan, $8 million in credit card and leasing draws, and $0.2 million in payment in kind interest and continuance fees.

**2. *Tilson Credit Support Term Sheet***

24. In connection with the Continuance Agreements, BNS requested that two individuals, who had signed a joint and several letter of undertaking to inject funds as necessary to adequately service the BNS Facilities, to provide an acknowledgement of their undertakings. One party declined to do so. At the time, the borrowing base shortfall was in excess of CA$7 million—as such, BNS informed the Applicants that additional security would be required to support the additional funding.

25. Gloria Tilson ("Gloria") and Sean Townley Tilson ("Sean" and collectively, the "Additional Guarantors") (who are related parties to a shareholder of the Debtors) agreed to provide such additional security. Gloria agreed to inject certain funds pursuant to which Gloria agreed to be liable for all principal, interest, and fees due and payable by the borrowers under the Loan Agreement. The Additional Guarantors also executed a limited recourse guarantee, which was limited in recourse to a charge in an amount of CA$2,000,000 against a property owned by the Additional Guarantors.

26. In exchange for providing the above guarantees to BNS, Gloria executed a credit support term sheet dated October 2, 2024 with the Debtors party to the Continuance Agreement (the "Credit Support Term Sheet"). The Credit Support Term Sheet provides Gloria with certain warrants in STS Renewables and that the "Credit Support Amount" (being the CA$2,000,000 limited recourse guarantee provided to BNS) outstanding at any time would accrue interest at 15% per annum, provided that the interest would only be due upon a specified maturity date or trigger

event. The Credit Support Amount is secured by a general security agreement dated November 12, 2024 between Gloria and the relevant Debtors, which security ranks subordinate only to the security in favor of BNS under the Loan Agreement.

**3. *Equipment Leases***

27. As noted above, a significant portion of the heavy equipment used in the operation of the Debtors' business (including drill rigs, heavy trucks, light trucks, and auxiliary equipment) is encumbered by capital leases registered under the applicable *Personal Property Security Act* in the various provinces or the *Uniform Commercial Code* in the US. The counterparties to these leases are BNS and various other equipment/vehicle financing companies. As of April 15, 2025, the Debtors collectively owe approximately CA$7.2 million under all of their capital and operating leases.

**B. Unsecured Obligations**

**1. *Convertible Notes***

28. The Debtors also raised financing through a series of unsecured convertible note issuances in 2022, 2023, and 2024 (collectively, the "Convertible Notes"). The purpose of these financings was to raise funds for general corporate purposes and acquisition capital. The Convertible Notes are subordinate to all current and future indebtedness and other obligations of STS Renewables undertaken in connection with the acquisition or leasing of equipment and other assets of any kind, as well as to all current and future indebtedness and other obligations of STS Renewables for borrowed money to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money.

29. As of May 1, 2025, there is approximately CA$13.2 million in principal outstanding with respect to the Convertible Notes, all of which have matured.

**2. *Other Indebtedness***

30. Among other funded indebtedness, STS Renewables has raised funds from certain of its shareholders (and parties related thereto) from time to time pursuant to certain unsecured grid promissory notes (the "Shareholder Promissory Notes"). The Shareholder Promissory Notes set out a grid schedule pursuant to which shareholders agree to advance additional funds (if any) to STS Renewables. The Shareholder Promissory Notes provide that the amounts advanced bear interest at 13% per annum, and the indebtedness thereunder shall rank *pari passu* with all other unsecured indebtedness of STS Renewables. As of the date hereof, many of the Shareholder Promissory Notes have matured without being repaid. The principal amount currently outstanding in respect of the Shareholder Promissory Notes is CA$2 million, none of which is yet overdue.

31. Furthermore, STS Renewables owes Pat Harris, the founder of Harris Exploration and current primary license holder or designee with respect to Harris Exploration's drilling licenses in the United States, approximately $144,000 pursuant to an earn-out agreement that was assumed by STS Renewables in connection with the Earth Drilling Acquisition. Additionally, as of April 15, 2025, Harris Exploration owes approximately $200,000 pursuant to the Harris Promissory Note[7] and the other credit extended by Mr. Harris.

**3. *Trade Vendors and Employee Liability***

32. The Debtors have significant arrears owing to third-party suppliers, many of whom are critical to the ongoing operations of the Debtors. As of April 15, 2025, the Debtors have over CA$7.6 million of accounts payable that were more than 30 days overdue, of that amount

[7] Pat Harris personally provided an unsecured line of credit to Harris Exploration and personally holds credit cards used by certain employees for Harris Exploration's corporate expenses. Certain amounts were paid down under the line of credit on September 12, 2022, and on the same date Harris Exploration agreed to repay Mr. Harris the remaining $295,667.08 outstanding in three annual installments pursuant to the terms of an unsecured, interest free promissory note (the "Harris Promissory Note").

approximately $985,000 is owed to vendors principally located in the United States.

33. As noted above, the Debtors employ approximately 105 employees who are paid on a bi-weekly basis. Although the Debtors will be able to fund their next pay cycle, without the proposed DIP Facility, the Debtors will be unable to meet their payroll obligations by the end of the month. In addition, vacation pay accrued since December 31, 2024 has not been paid out, and certain employee commissions have not been paid in recent months.

## IV. EVENTS LEADING TO THE CCAA PROCEEDINGS

### A. Efforts Prior to the Commencement of the CCAA Proceedings.

34. As described above, the Debtors have substantially expanded both the Utility Development Business and the Drilling Business in recent years. Through the Forum-Subterra JV, the Debtors have a large pipeline of GESAs with various developers and have identified several other opportunities to develop and acquire additional geothermal assets. The Businesses have generated over CA$84 million in revenue in the fiscal year 2024, and the Debtors believe there is potential for revenues to grow substantially over the coming years.

35. However, the Debtors have also struggled with liquidity of late. In part, this has been driven by the nature of the Debtors' businesses, which generate steady, long-term revenues but require substantial capital-investments up-front. The liquidity situation has been worsened because of a dispute with Forum over the past year, in which Forum Subterra Holdings Limited Partnership ("Forum Holdings") has refused to pay development fees and other amounts owing to SCPI and Earth Drilling Canada in the amount of approximately CA$400,000.

36. The Company has worked proactively to find a solution that would allow it to access additional capital and address its liquidity issues. In March 2023, SCPI retained outside support to assist with canvassing the market for a potential capital raise that would provide it with optionality to, among other things, pursue future geothermal utility assets, and continue to grow

the Drilling Business. After targeted outreach and interest from several investors, STS Renewables entered into exclusive negotiations with one of the interested parties. However, STS ultimately did not consummate a transaction and discussions with the interested party ended in August 2024.

37. With the Debtors' liquidity situation worsening, in part due to the secular decline in the real estate development market and resulting delay or cancellation of several potentially revenue-generating project, the Debtors engaged in discussions with BNS and retained a financial advisor to (among other things) assist with the preparation of cash flow modeling and to work with BNS to develop a go-forward plan. As discussed above, BNS ultimately agreed to provide additional liquidity pursuant to the Continuance Agreement dated October 2, 2024, which allowed the Debtors to continue to meet their immediate obligations. On September 25, 2024, PwC Corporate Finance ("PwC CF") was retained to, among other things, review the financial position of the Debtors, prepare a cash flow, and consider alternatives for the resolution of the Debtors' immediate liquidity issues.

38. During this engagement, it was agreed between the Debtors and BNS that the Debtors should be marketed in an out-of-court sales process to preserve its going-concern value. The board of directors of STS Renewables sought several proposals for the sale mandate and ultimately selected PwC CF to prepare and launch a sales process aimed at identifying potential buyers of, or investors in, STS Renewables (the "Pre-Filing Process").[8] Although certain parties expressed interest in acquiring the Business, no binding agreements were ultimately executed, and no party was willing to acquire the Debtors in an out-of-court process.

39. PwC CF was formally engaged in October 2024. PwC CF's engagement was

[8] PwC CF's mandate also included running a process to seek debt financing alternatives for the Debtors, but was ultimately requested by the Debtors to focus instead on the Pre-Filing Process seeking a sale of or investment in the business.

entered into by way of a separate engagement letter from PwC, and was initially structured on a success fee basis with a monthly work fee payable. At that point in time, PwC had limited involvement with the Company and did not provide any financial advisory services throughout the sales process.

40. Once preparation was completed, the PwC CF led sales process was launched in December 2024, and PwC CF reached out to more than 100 potentially-interested parties. The solicitation list included a mix of financial buyers, infrastructure investors, drilling companies and distressed asset funds. The marketing efforts were specifically focused on the EaaS business as a platform, rather than the individual Debtors.

41. Given the liquidity position of the Company, on April 22, 2025, the PwC CF mandate was changed from a success fee-based arrangement to a time and materials-based arrangement following execution of an addendum to the original engagement letter (the "PwC CF Addendum"). As a result of the PwC CF Addendum, PwC CF does not have a financial interest in the outcome of the proposed sales process in the CCAA Proceedings.

**B. Need for Canadian and U.S. Court Protection.**

42. As set out above, the Debtors are facing a liquidity crisis and are currently unable to satisfy their liabilities as they generally become due. The Debtors now require additional funding to meet their upcoming payroll obligations and to continue operating.[9] BNS is not willing to provide further increases to the Operating Facility Commitment and Continuance Agreements without customary protections provided to debtor-in-possession lenders. Without immediate relief, including a stay of proceedings, and the ability to access the financing contemplated by the

---

[9] The Debtors are projected to have sufficient funds to continue operations for the next ten days. However, the Debtors will need additional funding to continue operations going forward. BNS has expressed a willingness to provide further financing, and the Debtors and BNS are finalizing the terms of a debtor-in-possession financing facility (the "DIP Facility") to be provided by BNS (in such capacity, the "DIP Lender").

proposed DIP Facility (as defined herein) within the next two weeks, the Debtors will not be able to pay critical vendors and suppliers or meet payroll at the end of the month, which will likely cause the Debtors to cease operations and commence a forced liquidation.

43. In light of the foregoing, the Debtors made the decision to seek relief and protection under the CCAA in Canada and chapter 15 in the United States to provide the breathing space and stability necessary to continue operations and preserve enterprise value. The Debtors intend to utilize the CCAA and chapter 15 to obtain financing to meet critical expenses and to conduct an orderly sale process (the "Sale Process"). The Debtors believe that the proposed restructuring process described below constitutes the only viable means of preserving and maximizing value for their stakeholders and providing the stability and liquidity necessary to pursue the Sale Process.

44. These Chapter 15 Cases are of particular importance to the Debtors' business, assets, and operations in the United States (all of which are centrally managed from Canada). Recognition of the CCAA Proceedings through the Chapter 15 Cases will (i) ensure that the stay of proceedings is effective in the United States, which will prevent enforcement actions from being taken against the U.S. Subsidiaries or their assets; (ii) ensure that the U.S. Subsidiaries are able to access the proposed DIP Facility; and (iii) facilitate any restructuring transaction involving the U.S. Subsidiaries.

## V. THE CCAA PROCEEDINGS.

45. On May 15, 2025, the Debtors commenced the CCAA Proceedings with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the CCAA with the goal of conducting the Sale Process and restructuring operations under the protections offered by the CCAA. On May 15, 2025, the Canadian Court entered an interim order (the "Initial CCAA Order"). The Initial CCAA Order, attached as Exhibit 1 to the proposed order granting the Provisional Relief Motion (the "Provisional Relief Order"), includes a "no default" provision.

More specifically paragraph 13 of the Initial CCAA Order provides as follows:

> **THIS COURT ORDERS** that during the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, rescind, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence, authorization or permit in favour of or held by any of the STS Entities, except with the written consent of the applicable STS Entities and the Monitor, or leave of this Court.

Initial CCAA Order, ¶ 13.[10]

46. In addition, the Initial CCAA Order expressly requests that courts in the United States recognize the CCAA Proceedings to aid and assist the Canadian Court in carrying out the terms of the Initial CCAA Order. Paragraphs 44 and 45 of the Initial CCAA Order provide, in relevant part:

> **THIS COURT REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.
>
> **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

Initial CCAA Order, ¶¶ 44 – 45.

47. Furthermore, the Initial CCAA Order provides for the appointment of

---

[10] The Initial CCAA Order defines the "STS Entities" as the Debtors, Forum Subterra Limited Partnership, Forum Subterra General Partner Inc., Forum Subterra Limited Partnership 1, Forum Subterra GP1 Inc., Yorkland Geothermal Inc., Forum Subterra Limited Partnership 10, and FSLP GP Inc.

PricewaterhouseCoopers Inc. as monitor (in such capacity, the "Monitor") and the enhancement of the Monitor's powers; the maintenance of the Debtors' central cash management system; the stay of proceedings against all STS Entities; the approval of payments of certain limited prepetition obligations; the approval of an Administration Charge (in first place) to secure obligations to Debtors' counsel, the Monitor, and the Monitor's counsel; and the approval of a Directors' Charge (in second place) to secure the Debtors' indemnity obligations to directors and officers for liabilities that they might accrue by virtue of holding those positions after the filing date.

48. Following entry of the Initial CCAA Order, the Debtors will seek entry by the Canadian Court of an amended and restated initial order (the "Amended and Restated Initial Order") approximately ten days from the date of entry of the Initial CCAA Order. Through the Amended and Restated Initial Order, the Debtors will seek relief, in addition to the relief sought in the Initial CCAA Order, including to extend the stay period; approve STS Renewables' ability to borrow under the DIP Facility that is currently being negotiated with BNS; and grant a DIP Lender's Charge to secure all of the funds advanced under the DIP Facility.

49. I believe recognition of the CCAA Proceedings will not undermine the rights that United States creditors typically enjoy in a chapter 11 proceeding, as affected creditors will have the opportunity to the participate in the CCAA Proceedings under the supervision of the Canadian Court.

## V. APPOINTMENT AS FOREIGN REPRESENTATIVE AND FILING OF THE VERIFIED PETITION

50. On May 14, 2025, the Board of Directors of each of the Debtors (the "Board") authorized the Debtors to file the Verified Petition seeking recognition of the CCAA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. A copy of the resolution is attached as **Exhibit B** to the Verified Petition.

51. On May 15, 2025, the Canadian Court appointed STS Renewables as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code for purposes of the CCAA Proceedings.

52. It is my understanding that for these reasons, STS Renewables satisfies the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

53. Of the nine Debtors, three are incorporated in Delaware and one is incorporated in California. Each of the Debtors have property in the United States (and specifically in Delaware) in the form of Delaware corporation stock, a retainer in counsel's Delaware trust account, or have affiliates whose Chapter 15 Cases are pending in this district.

54. Therefore, on the Petition Date, STS Renewables filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing these Chapter 15 Cases in the District of Delaware, seeking recognition of the CCAA Proceedings as "foreign main proceedings," as such term is defined in section 1502(4) of the Bankruptcy Code, and seeking other necessary or appropriate relief in support of the CCAA Proceedings. I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "the center of its main interests." See 11 U.S.C. § 1517(b)(1).

55. I have been informed that the CCAA Proceedings are "foreign proceedings" as they are a collective judicial proceeding authorized and supervised by the Canadian Court under the CCAA and pursuant to the Initial CCAA Order. It is my understanding that for these reasons, the CCAA Proceedings qualify as "foreign proceedings" as that term is defined in Section 101(23) of the Bankruptcy Code. In compliance with Section 1515(b) of the Bankruptcy Code, a certified

copy of the Initial CCAA Order, which commenced the CCAA Proceedings, is attached to the Provisional Relief Order as Exhibit 1.

56. In addition, I believe that each of the Debtors has their center of main interests, as such term is defined in section 1502(4) of the Bankruptcy Code, in Toronto, Ontario, Canada. The Debtors' parent company, STS Renewables, is a Canadian corporation that directly or indirectly has a one-hundred percent ownership interest in the common stock of the remaining Debtors. Additionally, the Debtors are an integrated, complex enterprise, and the Debtors' administrative, support, and other functions are performed on a centralized basis and managed in Canada, namely:

a. the Debtors' operations are overseen by and report to the Chief Executive Officer, located at the Corporate Head Office;

b. the Debtors' senior management team has historically been located in Canada,[11] and, as of the Petition Date, I, as a director of each of the Debtors, am located in Toronto, Ontario, Canada;

c. all creative, strategic, and key operating decisions and key policy decisions are made by and/or subject to approval from STS Renewables' senior management located in Canada;

d. key human resources decisions pertaining to, *inter alia*, payroll budgets and augmentation or reduction of employee headcount as per the approved budget, are subject to the approval of the Debtors' senior management located in Canada;

e. key accounting decisions and all plans, budgets, and financial projections

[11] Most of the Debtors' senior management and directors are located in Toronto, Ontario, Canada, with one director located in Calgary, Alberta, Canada.

are subject to the approval of the Debtors' senior management located in Canada;

f. planning, budgeting, management of tax, treasury, and cash management functions, and preparation of financial projections for the Debtors is done from Toronto, Ontario, Canada;

g. all material and/or long-term contracts and expenses are subject to the approval of senior management located in Canada;

h. marketing and business development initiatives are overseen from the Debtors' offices in Canada;

i. corporate governance and regulatory compliance for the Debtors is overseen from its management team located in Toronto, Ontario, Canada;

j. meetings for management and senior staff of the Debtors, including board meetings, are regularly held in Toronto, Ontario, Canada; and

k. senior management and all sales and operations staff report to their respective senior executives, who, ultimately, report to STS Renewables' Chief Executive Officer, who is based in Toronto, Ontario, Canada.

57. Based on these facts, I believe that recognition of the CCAA Proceedings as foreign main proceedings is warranted.

58. I also believe recognition of STS Renewables as the Debtors' "foreign representative" and recognition of the CCAA Proceedings as "foreign main proceedings" are consistent with the purpose of chapter 15 and will allow the Debtors to restructure in the most efficient manner without jeopardizing the creditors' rights.

59. The Debtors are affiliates of each other and each of their cases were filed on the Petition Date in this court (the "Bankruptcy Court"). Accordingly, I believe that joint administration of these Chapter 15 Cases for procedural purposes only, as well as permitting the filing of consolidated lists of the information required by Bankruptcy Rule 1007(a)(4), will be an administrative convenience for the Bankruptcy Court, the court clerk's office, and interested parties.

60. Further, I believe that noticing procedures are appropriate in light of the voluminous amount of creditors, potential creditors, and other parties of interest, all of whom need to be provided with, among other things, notice of the entry of the provisional order, the proposed final order, the recognition objection deadline, and the recognition hearing. The Foreign Representative has prepared a form of notice advising of these and related matters (the "Recognition Hearing Notice"), a copy of which is annexed to the Notice Procedures Motion. Under the facts and circumstances of the Debtors' Chapter 15 Cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Verified Petition and associated objection deadline and hearing dates.

61. Also, for the reasons set forth in the Verified Petition, I submit that recognition of the CCAA Proceedings is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

62. In accordance with the foregoing, I present the following consolidated statements for the Debtors as a whole.

## VI. STATEMENT PURSUANT TO SECTION 1515 OF THE BANKRUPTCY CODE.

63. I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

> (a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
>
> (b) A petition for recognition shall be accompanied by—
>
> > (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
> >
> > (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
> >
> > (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
>
> (c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

64. Pursuant to section 1515(b) of the Bankruptcy Code, the Initial CCAA Order, in which the Canadian Court appointed the Foreign Representative, is attached to the Provisional Relief Order as Exhibit 1. The Canadian Court issued the Initial CCAA Order appointing STS Renewables as the Foreign Representative, authorizing STS Renewables to file the Verified Petition, and authorizing STS Renewables to commence these Chapter 15 Cases.

65. Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition of a "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe the CCAA Proceedings are "foreign proceedings" as defined therein. I am aware of no other foreign proceedings with respect to the Debtors.

## VII. DISCLOSURE PURSUANT TO BANKRUPTCY RULE 1007(A)(4).

66. I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

> If a foreign representative files a petition under Chapter 15 for recognition of a foreign proceeding, the representative must—in addition to the documents required under § 1515—include with the petition: (A) a corporate-ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of: (i) all persons or bodies authorized to administer the debtor's foreign proceedings; (ii) all entities against whom provisional relief is sought under § 1519; and (iii) all parties to litigation pending in the United States in which the debtor was a party when the petition was filed.

67. I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement, "identif[y] any parent corporation and any publicly held corporation that owns 10% or more of its stock or stating that there is no such corporation." Fed. R. Bankr. P. 7007.1(a).

### A. Corporate Ownership Statement.

68. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the following is a corporate ownership statement of the Debtors, which identifies any corporation that directly or indirectly owns 10% or more of any class of the Debtors' equity interests:

- No publicly held corporation owns more than 10% of the stock in STS Renewables.[12]
- STS Renewables owns 100% of the common equity interests in each of Earth Drilling Canada; STS US; SCPI; and SCPI US.
- Earth Drilling Canada owns 100% of the equity interests in On Track.
- STS US owns 100% of the equity interests in Earth Drilling US, which, in turn, owns 100% of the equity interests in Harris Exploration.
- SCPI owns 100% of the equity interests in Subterra Development.

---

[12] The following entities own more than 10% of the outstanding common stock of STS Renewables as of the Petition Date: Avebury Equity Partners Ltd. (39.81%) and 2016454 Ontario Inc. (17.35%).

**B. List of Administrators.**

69. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtors, as directed by their Board and the Foreign Representative, shall maintain control of and be authorized to administer the CCAA Proceedings. The service address for all of the Debtors in these Chapter 15 Cases is: 365 Bloor Street East, Suite 400, Toronto, Ontario M4W 1H7. I am aware of no other persons or bodies authorized to administer the CCAA Proceedings on behalf of the Debtors.

**C. Provisional Relief.**

70. Through the Provisional Relief Motion, provisional relief is sought with respect to each of the Debtors against the following parties: (a) BNS; (b) counterparties to certain of the Debtors' executory contracts and unexpired leases; (c) litigation counterparties; and (d) other creditors, as set forth on the *Consolidated Verified List Pursuant to Fed. R. Bankr. P. 1007(a)(4), 1008, and 2002(q)* appended to each Voluntary Petition.

**D. Parties to Litigation Pending.**

71. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtors have attached a list of all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the Chapter 15 Cases in Schedule 1 to the *Consolidated Statement Pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(4)*, filed concurrently herewith.

## VIII. STATEMENT IN SUPPORT OF PROVISIONAL RELIEF MOTION.

72. STS Renewables commenced these Chapter 15 Cases in order to provide the Debtors with the breathing room and stability necessary to implement their restructuring, including by seeking certain provisional relief between the Petition Date and the Bankruptcy Court's entry of the proposed order recognizing the CCAA Proceedings. Such provisional relief

includes, among other things, the Bankruptcy Court's immediate ordering of the application of sections 361, 362, and 365(e) of the Bankruptcy Code to these Chapter 15 Cases. While the Debtors received stay protection pursuant to the Initial CCAA Order, the Debtors may be exposed to potentially adverse action in the United States by certain creditors and other parties in interest (including counterparties to the Debtors' contracts) who may disregard the stay imposed by the Initial CCAA Order.

73. Additionally, the Debtors' commencement of the CCAA Proceedings and these Chapter 15 Cases are, or may be asserted to be, triggers, events of default, and subsequent cross-default under certain of the Debtors' unexpired leases and executory contracts. Further, certain of the Debtors' executory contracts and unexpired leases contain provisions permitting termination upon the Debtors' filing of a case under any section or chapter of the Bankruptcy Code. The relief requested by the Debtors is required to prevent individual creditors or contract counterparties acting to frustrate the purpose of the CCAA Proceedings by disregarding the Initial CCAA Order, the foremost of which is the fair and efficient administration of the CCAA Proceedings and Sale Process to maximize the value for all creditors.

74. Accordingly, I believe that the provisional relief requested in the Provisional Relief Motion is necessary and appropriate under the circumstances.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 15th day of May, 2025

Toronto, Ontario, Canada

*/s/ Matthew Tokarik*
Matthew Tokarik, in his capacity as Authorized Representative of STS Renewables Ltd., the Foreign Representative