# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| STS RENEWABLES LTD., et al.,[1] | Case No. 25-10884 (KBO) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

### FOREIGN REPRESENTATIVE'S MOTION FOR ENTRY OF AN ORDER: (I) RECOGNIZING AND ENFORCING (A) THE CCAA APPROVAL AND REVERSE VESTING ORDER, AND (B) THE EQUIPMENT SALE APPROVAL AND VESTING ORDER; (II) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

STS Renewables Ltd. ("STS"), in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"), which are the subject of jointly-administered proceedings (the "Canadian Proceedings") under the Companies' Creditors Arrangement Act,[2] in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), submits this motion (the "Motion"), pursuant to sections 105(a) 363, 1501, 1507, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the United States Bankruptcy Court for the District of Delaware (the "Court"), seeking entry of an order, substantially in the form attached

---

[1] The Debtors in these chapter 15 cases (the "Chapter 15 Cases"), along with the last four digits of each Debtor's unique identifier, are: STS Renewables Ltd. (6458); Earth Drilling Co. Ltd. (2067); On Track Drilling Inc. (0775); Subterra Capital Partners Inc. (1618); Subterra Development Ltd. (8868); Earth Drilling Co. Ltd. (5471); STS Renewables Earth USA Acquisition Co. Ltd. (9095); Harris Exploration Drilling & Associates Inc. (9416); and Subterra Capital Partners US Inc. (0344). The Debtors' service address for purposes of these Chapter 15 Cases is 3400 One First Canadian Place, P.O. Box 130, Toronto, ON, M5X 1A4.

[2] R.S.C. 1985, c. C-36 (as amended, the "CCAA").

hereto as **Exhibit A** (the "Proposed Order"): (I) recognizing and enforcing the Canadian Court's

(a) *Approval and Reverse Vesting Order* (the "Reverse Vesting Order") approving the agreement of purchase and sale and subscription agreement dated effective as of September 19, 2025 (the "Drilling Purchase Agreement"), among STS, Earth Drilling Co. Ltd ("Earth Drilling"), On Track Drilling Inc. ("On Track"), STS Renewables Earth USA Acquisition Co. Ltd. ("STS USA"), Earth Drilling Co. Ltd. ("Earth Drilling US"), and Harris Exploration Drilling & Associates Inc. ("Harris") (collectively, the "STS Entities") and 2734655 Alberta Ltd. ("273" or the "Drilling Purchaser") and the related transaction contemplated by the Drilling Purchase Agreement (the "Drilling Transaction"); and

(b) *Approval and Vesting Order* (the "Equipment AVO") authorizing Earth Drilling to complete sales transactions pursuant to the Bills of Sale (as defined below) with certain purchasers (the "Equipment Purchasers") of the Equipment (as defined below);

(II) approving, under sections 363, 1520 and 1521 of title the Bankruptcy Code, the sale, free and

clear of all liens, claims, and encumbrances, of all of the Debtors' right, title and interest in the assets

subject to the Drilling Purchase Agreement (including the transfer of the Subscribed Shares (defined

below)), and the Equipment AVO; and (III) granting related relief. Copies of the proposed forms of

the Reverse Vesting Order and the Equipment AVO are attached to the Proposed Order as **Exhibits**

**1**, and **2**, respectively.[3]

In support of the requested relief, the Foreign Representative relies upon and incorporates the

following by reference: (a) the *Declaration of Matthew Tokarik in Support of Foreign*

*Representative's Motion for Entry of an Order: (I) Recognizing and Enforcing (A) the CCAA*

*Approval and Reverse Vesting Order, and (B) the Equipment Sale Approval and Vesting Order; (II)*

*Approving the Sale of Assets Free and Clear of Liens, Claims, and Encumbrances; and (III)*

*Granting Related Relief* (the "Tokarik Declaration"); and (b) the *Declaration of Sean Zweig in*

---

[3] The Foreign Representative expects that the Vesting Orders will be approved and entered by the Canadian Court before the hearing on this Motion. The Foreign Representative will file a notice of entry of the Vesting Orders as soon as practicable after their entry by the Canadian Court.

*Support of Foreign Representative's Motion for Entry of an Order: (I) Recognizing and Enforcing (A) the CCAA Approval and Reverse Vesting Order, and (B) the Equipment Sale Approval and Vesting Order; (II) Approving the Sale of Assets Free and Clear of Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (the "Zweig Declaration"), each filed contemporaneously herewith. The Foreign Representative further represents to the Court as follows:

### Jurisdiction and Venue

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). The Foreign Representative confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.  Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).

3.  The statutory bases for the relief requested herein are sections 105(a), 363, 1501, 1507, 1520, and 1521 of the Bankruptcy Code; Bankruptcy Rules 2002, 6004, 6006, and 9014; and Local Rule 6004-1.

### Background

**A.      Events Leading to the Canadian Proceedings and Chapter 15 Cases.**

4.  The Debtors are a vertically integrated geothermal energy system developer that provides renewable heating and cooling to multi-residential building developers. Their business is

controlled by STS, a private Canadian corporation that directly or indirectly wholly owns each of the other Debtors. The Debtors' two complementary business segments, both of which primarily operate in the geothermal industry, are: (i) a business segment focused on utility development (the "Utility Development Business"), through which they utilize an "energy-as-a-service" business model, and (ii) a business segment focused on geothermal, geotechnical, oil sands, and mineral-exploration drilling (the "Drilling Business," and, together with the Utility Development Business, the "Business"), through which they specialize in the drilling required to install geothermal energy systems. The Drilling Business has employed the majority of the Debtors' employees—as of April 15, 2025, nine employees were employed by the Debtors in connection with the Utility Development Business and ninety-six employees were employed in connection with the Drilling Business. The Utility Development Business operates through a joint venture with a subsidiary of Forum Investment and Development Corporation. The Debtors operate across Canada and the United States.[4]

5.     As set forth in more detail in the Initial Foreign Representative Declaration, the Debtors' liquidity situation deteriorated in the lead-up to the commencement of the Canadian Proceedings and these Chapter 15 Cases. Both proceedings were commenced with the goal of obtaining financing to meet critical expenses and conducting a sale process.

---

[4]     A detailed description of the Debtors and their businesses and the facts and circumstances surrounding these chapter 15 cases are set forth in (a) the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 5] (the "Verified Petition," and, together with the official form petitions filed concurrently therewith, the "Petition"), (b) *Declaration of the Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified   Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 7] (the "Initial Foreign Representative Declaration"), and (c) the *Declaration of Sean Zwieg in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 6] (the "Initial Zwieg Declaration").

6.     On May 15, 2025, the Debtors commenced the Canadian Proceedings with the Canadian Court. That same day, the Canadian Court entered an initial order (the "Initial CCAA Order") authorizing, among other things, the Foreign Representative to act as the Debtors' foreign representative and seek this Court's assistance via chapter 15 of the Bankruptcy Code. On May 20, 2025, the Canadian Court entered its *Amended and Restated Initial Order* (the "Amended Initial CCAA Order").

7.     On May 15, 2025 (the "Petition Date"), the Foreign Representative commenced these Chapter 15 Cases by filing a Petition for each Debtor.  On May 20, 2025, this Court entered an order directing the joint administration and procedural consolidation of the Chapter 15 Cases [Docket No. 19].

8.     On June 10, 2025, this Court entered an order (the "Recognition Order") granting the Verified Petition, recognizing the Canadian Proceedings as a foreign main proceeding, recognizing the Foreign Representative, and granting related relief [Docket No. 27].  The Recognition Order further gave full force and effect to the Initial CCAA Order and the Amended Initial CCAA Order.

**B.     The Sale Process and Purchase Agreements.**

       **(i)     Sale Process.**

9.     On May 23, 2025, the Canadian Court entered its *SISP Approval Order* [Docket No. 23-2] (the "SISP Approval Order").  The SISP Approval Order approved and authorized a sale and investment solicitation process (the "SISP").  The SISP is attached to the SISP Approval Order as Exhibit A.

10.    The SISP provided for the Debtors and PricewaterhouseCoopers Inc., in its capacity as monitor (the "Monitor") of the Debtors, to implement the SISP and for the Monitor to lead a two-phase process to canvass the market for a value maximizing transaction or transactions.  A high-level summary of the conduct and results of the SISP follows below.[5]

11.    Shortly after the SISP Approval Order was granted by the Canadian Court, the Monitor broadly canvassed the market by contacting sixty-two known potential bidders (the "Potential Bidders"), including forty-five strategic parties and seventeen financial parties with experience in the sectors in which the Debtors operated. Several of these parties had been contacted previously pursuant to a prefiling sale process conducted by PricewaterhouseCoopers Corporate Finance Inc. ("PwC CF"), which saw PwC CF contact over 100 potentially interested parties. Ultimately, twenty-eight parties executed NDAs to review relevant information in respect of the Debtors in accordance with the SISP.

12.    The SISP contemplated that any party who is a director, officer, employee, or other non-arms' length party in relation to the Debtors (each such person, an "Insider") could participate in the SISP as a Potential Bidder, provided that the Monitor would not provide any information to the Insider whereby the Insider's receipt of such information might create an unfair advantage or jeopardize the integrity of the SISP.  The Drilling Purchaser is owned and managed by certain Insiders, including John Paul Wegleitner, a director and officer of multiple Debtors.  The Monitor was informed of such Insiders' intention to participate in the SISP at its outset and therefore

_____

[5]    On October 8, 2025, the Monitor filed its *Fifth Report of the Monitor* with the Canadian Court (the "Fifth Report").  A true and correct copy of the Fifth Report, which addresses the results of the SISP and the Vesting Orders, is attached to the Zweig Declaration as Exhibit C.

incorporated and implemented appropriate safeguards to ensure the fairness of the SISP for all Potential Bidders.

13.     As of the Phase I LOI Deadline (as defined in the SISP), which called for the submission of nonbinding letters of intent, nine bids were received. The SISP provided that a bid that was compliant with the requirements to be considered a Phase I LOI would be considered by the Monitor and evaluated based on a variety of factors, including: (i) the net value provided by the sale proposal or investment proposal; (ii) the identity, circumstances, and ability of the Potential Bidder to successfully complete such transactions; (iii) the proposed transaction documents; (iv) factors affecting the speed, certainty, and value of the transactions; (v) the property included or excluded from the proposed transactions; (vi) any related restructuring costs; and (vii) the likelihood of consummating such transaction, each as determined by the Monitor in consultation with the Debtors and the Bank of Nova Scotia ("BNS"), the Debtors' senior secured lender and provider of debtor-in-possession financing in the Canadian Proceedings (in such capacity, the "DIP Lender"). Ultimately, on July 2, 2025, upon consultation with the DIP Lender and the Debtors, the Monitor invited five of these parties to participate in Phase II (as defined in the SISP), and subsequently invited three additional parties to participate in Phase II on the understanding that they would submit binding bids by the Phase II Bid Deadline (as defined in the SISP).

14.     As of the Phase II Bid Deadline, the Monitor had received three bids. The bids included offers with respect to both the Utility Development Business and the Drilling Business, as well as a liquidation bid.  A second liquidation bid was also received after the Phase II Bid Deadline.

15.     The SISP originally contemplated that the Monitor would identify a successful bidder or successful bidders by August 6, 2025. However, the Monitor, in consultation with the Debtors and with the consent of the DIP Lender, extended that deadline (on notice to interested parties) first to August 28, 2025, and subsequently to September 5, 2025, in order to better progress discussions with the potential bidders.

16.     On September 5, 2025, with the consent of the DIP Lender and in consultation with the Debtors, and in consideration of the factors enumerated in the SISP, the Monitor designated 273 as a successful bidder.  The bid submitted by 273 was the only going-concern offer received for any portion of the Debtors' Drilling Business and provided greater value than the liquidation bids for the assets held by the Debtors for the Drilling Business.  The Monitor did not designate any other bids as Successful Bids on that date.

## C.      The Drilling Purchase Transaction and Reverse Vesting Order.

17.     Following negotiations and discussion involving the Drilling Purchaser, the Debtors, the Monitor, and the DIP Lender, the Drilling Purchase Agreement was executed on September 30, 2025, with an effective date of September 19, 2025 (for purposes of the working capital adjustment).

18.     The principal terms of the Drilling Purchase Agreement are summarized below. [6] Though this Motion is not the type of sale motion that is contemplated by Local Rule 6004-1, the Foreign Representative is including an overview of certain of the material terms set forth in Local

---

[6]     The summary of the Drilling Purchase Agreement contained herein is qualified in its entirety by the Drilling Purchase Agreement. To the extent there are any conflicts between the summary of the Drilling Purchase Agreement contained herein and the Drilling Purchase Agreement, the terms of the Drilling Purchase Agreement shall govern.

Rule 6004-1(b) to provide a summary of the Drilling Purchase Agreement and the Drilling

Transaction for the benefit of the Court and other parties in interest.

| Term | Details[7] |
|---|---|
| Vendor and Related Parties | STS (Vendor) <br><br> STS USA, Earth Drilling, On Track, Earth Drilling US, Harris (Parties) |
| Purchaser | 273 |
| Transaction Structure | Reverse vesting share subscription transaction structure. |
| 1.1 "Excluded Assets," "Excluded Contracts," and "Excluded Liabilities" | The Excluded Assets, Excluded Contracts, and Excluded Liabilities will be transferred to ResidualCo in accordance with the Closing Sequence. The "**Excluded Assets**" means all of the Subsidiaries' right, title and interest in and to those assets that are not Retained Assets, and "**Excluded Contracts**" and "**Excluded Liabilities**" are all Contracts and Liabilities not designated as Retained Contracts and Retained Liabilities, respectively. |
| 1.1 "Purchase Price" | $11,794,408.52, as adjusted within the Drilling Purchase Agreement. |
| 1.1 "Retained Employees" | "**Retained Employees**" means the Employees listed at Appendix II Schedule "A." The Retained Employees, who will be retained after Closing Time, consist of 74 of Earth Drilling's employees (all but one of Earth Drilling's employees as of the effective date), 9 of On Track's employees (all of On Track's employees as of the effective date), and 33 of Harris's employees (all employees as of the effective date). Neither Earth Drilling US or STS USA have any employees. The remaining employees are "Excluded Employees" who are required to be terminated prior to Closing. |
| 1.1 "Retained Liabilities" | "**Retained Liabilities**" means: <br><br> (a)    all debts, liabilities, obligations, and Cure Costs under the Retained Contracts from and after the Closing Time; <br><br> (b)    all debts, liabilities, and obligations arising from and after the Closing Date with respect to Retained Employees; <br><br> (c)    Tax liabilities of the Drilling Subsidiaries for the period from and after the Closing Time; and <br><br> (d)    all debts, liabilities, and obligations arising from ownership and use of the Retained Assets for the period from and after |

---

[7] All capitalized terms in this table not otherwise defined have the meaning ascribed to them in the Drilling Purchase Agreement.

| | |
|---|---|
| | the Closing. |
| 1.1. "Subscribed Shares" | Means 100 common shares to be issued in the capital of each of Earth Drilling and STS USA. |
| 3.1 Sale and Purchase and Vesting | Subject to the terms and conditions of the Drilling Purchase Agreement, at the Closing Time, following the cancellation of the Existing Shares, STS USA and Earth Drilling will issue the Subscribed Shares to the Drilling Purchaser; the Drilling Purchaser will subscribe for and acquire the Subscribed Shares free and clear of all Encumbrances; and the Drilling Purchaser will become the sole owner of all of the issued and outstanding shares in the capital of Earth Drilling and STS USA following Closing. |
| 5.1 Satisfaction of Purchase Price | Subject to the Working Capital Adjustment, the Purchase Price shall be satisfied by the Purchaser as follows:<br><br>(a) By the Deposit of $1,045,559.15, which has been received by the Monitor.<br><br>(b) As to $1,332,642.93 of the Purchase Price, by way of continuing to service the Outstanding Equipment Lease Obligations; and<br><br>(c) As to the amount equal to the Purchase Price less the Deposit, less the amount of the Outstanding Equipment Lease Obligations, and less other deductions expressly stipulated herein (the "**Cash Balance**"), by wire transfer of immediately available funds on the Closing Date to the Monitor, to be held in trust for the Vendor. |
| 5.2 Deposit | The Deposit is nonrefundable unless the Drilling Purchase Agreement is terminated by the Drilling Purchaser as a result of the Vendor failing meet any condition in favor of the Drilling Purchaser by the Closing Date. |
| 5.4 Working Capital Agreement | The Parties have reached agreement regarding the Drilling Subsidiaries' working capital from the effective date forward. Among other things, the Purchaser shall be responsible for all recorded accounts payable and payroll costs, and entitled to all recorded accounts receivable (subject to certain carve-outs) as of the effective date. |
| 8 Conditions | The Drilling Purchase Agreement is subject to standard conditions precedent in favour of the Vendor and the Drilling Purchaser. |
| Closing | As soon as possible after entry of U.S. recognition and enforcement order but in no event later than October 31, 2025 |
| 9.2 Closing Sequence | On the Closing Date, Closing shall take place in the Closing Sequence |

|  | described below: |
|  | (a) First, the Drilling Purchaser shall deposit the remaining cash portion of the Purchase Price (that has not already been provided as the Deposit) with the Monitor, which shall be held in escrow by the Monitor, on behalf of the Vendor, to be released in accordance with this Closing Sequence; |
|  | (b) Second, the Vendor shall (i) transfer or cause to be transferred to and cause ResidualCo to assume the Excluded Assets and the Excluded Contracts pursuant to the Reverse Vesting Order and (ii) transfer or cause to be transferred to and cause ResidualCo to assume the Excluded Liabilities pursuant to the Reverse Vesting Order; |
|  | (c) Third, the Vendor, STS USA, and/or Earth Drilling, as applicable, shall file the Articles of Reorganization, and all Existing Shares as well as any agreement, contract, plan, indenture, deed, certificate, subscription right, conversion right, preemptive right, option (including stock options or share purchase or equivalent plans) or other document or instrument governing or having been created or granted in connection with the share capital of STS USA and Earth Drilling shall be deemed to be terminated and cancelled for no consideration in accordance with and pursuant to the Reverse Vesting Order; and |
|  | (d) Fourth, after completing all actions above, the Vendor shall cause the Subscribed Shares to be issued and the Purchaser shall subscribe for and purchase the Subscribed Shares, and the cash portion of the Purchase Price shall be released from escrow by the Monitor for the benefit of the Vendor, subject to the terms of the Reverse Vesting Order. |
| Reverse Vesting Order ⁋ 20 Releases | Releases typical in reverse vesting transaction with certain carveouts. |
| Sale to Insider | 273 is owned and managed by certain Insiders. |

19.     The Drilling Purchase Agreement contemplates that the Drilling Purchaser will pay a total Purchase Price of $11,794,408.52, subject to the agreed treatment of certain accounts payable and accounts receivable discussed further below.   As noted above, the Purchase Price is to be satisfied by (i) the cash deposit of $1,045,559.15, which has been received by the Monitor; (ii) the

assumption of $1,332,642.93 of outstanding obligations owing under equipment leases to which the Debtors are party (the "Outstanding Equipment Lease Obligations"); and (iii) a cash payment of the remainder of the Purchase Price less the Deposit and less the amount of the Outstanding Equipment Lease Obligations. As described in the chart above, the parties have also reached an agreement with respect to the Drilling Subsidiaries' working capital.

20.     As discussed further below in connection with the Equipment AVO, a portion of the cash value of the Purchase Price under the Drilling Purchase Agreement (the "Cash Purchase Price") is contemplated to be funded using the proceeds from sales of certain equipment. The Debtors intend to first close the Equipment sales and then use the cash proceeds received thereunder to fund the remaining Cash Purchase Price and close the Drilling Transaction.

**(i)     The Reverse Vesting Structure.**

21.     The Drilling Purchase Agreement contemplates a "reverse vesting" transaction. Reverse vesting transactions have become an increasingly common feature of CCAA proceedings, and are frequently approved by the Canadian Court.

22.     In a traditional asset sale transaction, all purchased assets are purchased and transferred to a purchaser on a "free and clear" basis, and all excluded assets, excluded contracts, excluded employees, and excluded liabilities remain with the debtor entity. In a reverse vesting transaction, all excluded assets, excluded contracts, excluded employees, and excluded liabilities are assigned to one or more entities (typically a newly created entity) that will be added as a debtor in the Canadian proceeding. The ownership of the acquired debtors is vested in the purchaser, with the acquired debtors emerging from the Canadian proceeding with their retained assets and retained

liabilities, now free and clear of the excluded assets, excluded contracts, excluded employees, and excluded liabilities.

23.     Thus, the Drilling Transaction, due to the "reverse vesting" structure as approved in the Reverse Vesting Order, will have the following effects, among others:

> a.     following cancellation of all existing shares, the Drilling Purchaser will subscribe for and own 100% of the common shares to be issued in Earth Drilling and STS USA (the "Subscribed Shares") and will thus directly and indirectly acquire 100% ownership of the Drilling Subsidiaries;

> b.     Excluded Assets, Excluded Liabilities, and Excluded Contracts will be transferred to a newly incorporated company, 1001374205 Ontario Inc. ("ResidualCo.") so as to allow the Purchaser to acquire the Subscribed Shares on a "free and clear" basis. ResidualCo will be added as a Debtor to the Canadian Proceedings in place of Earth Drilling and STS USA; and

> c.     the Drilling Purchaser will retain the Retained Assets, the Retained Liabilities and the Retained Contracts (and related obligations), as well as a substantial majority of the Debtors' remaining employees.

24.     The Reverse Vesting Order approves the "reverse vesting" structure of the Drilling Transaction—i.e., the transfer of liabilities out of the Drilling Subsidiaries (as defined in the Drilling Purchase Agreement) and into Residual Co., and the Drilling Purchaser's purchase of the newly-issued shares of STS USA and Earth Drilling, which wholly own the remaining Drilling Subsidiaries. The Reverse Vesting Order provides that all claims will be vested out of the Drilling Subsidiaries and such claims will attach to the liabilities vested in ResidualCo.

25.     In the United States, Harris Exploration holds licenses with state governments that allow it to conduct exploration drilling in Arizona, California, Nevada, and Utah; in Ontario, Earth Drilling holds an Environmental Compliance Approval issued by the government of Ontario that allows it to conduct geothermal drilling and geothermal system installation. The Licenses are critical

to the continued operations of the Drilling Business. An important purpose of the reverse vesting structure is to preserve the Licenses and therefore to allow for an efficient operational transfer of the Drilling Business following the closing of the Drilling Transaction. In a traditional asset sale, the Drilling Purchaser would acquire the Drilling Subsidiaries' assets, but the Licenses would need to be reissued to the Drilling Purchaser, which would extend the time required to close the Drilling Transaction and would increase costs and risks associated with closing.

26.     Further, certain of the Drilling Subsidiaries are party to material contracts with large customers. In an asset sale, a new party would need to contract with these customers, which would require the customers to start a new tender process—as such, an asset purchase transaction would risk losing these material contracts. The reverse vesting structure will therefore allow the Drilling Purchaser to keep these key material contracts in place and will ensure all retained contracts remain with the Drilling Subsidiaries in an efficient manner more generally. Finally, the reverse vesting structure will provide for an efficient structure to allow for continuity of employment of the vast majority of the Drilling Subsidiaries' employees.

27.     Moreover, the Drilling Purchaser was not prepared to proceed with an asset purchase structure (i.e., the Drilling Purchaser required the transaction to be structured as a reverse vesting order).

28.     The Reverse Vesting Order contains releases (the "Releases") and protections in favor of certain parties, including, among others, the current and former directors, officers, and legal counsel of the Drilling Subsidiaries and ResidualCo; the Monitor and its legal counsel; and the Monitor's respective current directors, officers, partners, employees, and advisors (collectively, the

"Released Parties"). The releases cover any and all claims arising in connection with or relating to the Canadian Proceedings; the Drilling Purchase Agreement; the consummation of the Drilling Transaction; and any closing document, agreement, document, instrument, matter, or transaction involving the Subsidiaries arising in connection with or pursuant to any of the foregoing, subject to certain enumerated exceptions. The Releases are limited and enhance the certainty and finality of the Drilling Transaction and the Canadian Proceedings. The released claims do not include any claim for fraud or willful misconduct or any claim that is not permitted to be released pursuant to subsection 5.1(2) of the CCAA. The Releases also carve out certain claims against the former principals of STS, along with any party that granted an undertaking to inject funds or guarantees in favor of BNS in relation to indebtedness of the STS Entities.

**(ii)** **Disputed Assets.**

29. On June 20, 2025, U.S. counsel to the Foreign Representative received a letter from counsel to TransPecos Bank, SSB ("TransPecos"), a Texas state savings bank. In that letter, TransPecos asserted an ownership interest in two items of heavy equipment in the possession of the Debtors—a drill rig and a mud recycling system (together, the "Disputed Assets"). TransPecos stated that it was the assignee/successor lessor of such equipment and that the former lessee (the "Original Lessee"), a third party unrelated and unknown to the Debtors, had purported to re-lease the Disputed Assets to another third party (the "Second Lessee") without the knowledge or consent of TransPecos.

30. On June 30, 2025, Pachulski Stang Ziehl & Jones, U.S. counsel to the Debtors ("PSZJ") responded to counsel to TransPecos to, among other things, confirm that Earth Drilling was

in possession of the Disputed Assets and to confirm that the Disputed Assets were purchased from the Second Lessee in good faith, for fair value, and without any notice that any party, including the Original Lessee or TransPecos, was asserting a legal or equitable interest in the Disputed Assets. Pachulski therefore informed TransPecos that Earth Drilling is the legal and equitable owner of the Disputed Assets and that such assets were being marketed pursuant to the SISP. TransPecos continues to assert an ownership interest in the Disputed Assets.

31. The Disputed Assets are being treated as "Excluded Assets" under the Drilling Purchase Agreement. The Drilling Purchaser will not acquire the Disputed Assets, and claims in respect of the Disputed Assets will not be vested out of the Disputed Assets pursuant to the Reverse Vesting Order. Instead, the Disputed Assets will be transferred to ResidualCo, which will be added as an Applicant in the Canadian Proceedings subject to the Monitor's oversight. The Debtors intend to engage with TransPecos in the near term to attempt to reach a consensual resolution for dealing with the Disputed Assets.

**D.     The Equipment AVO**

32. The Drilling Purchaser has obtained financing from a third party that will enable it to fund the majority of the Cash Purchase Price payable in respect of the Drilling Transaction. However, this financed amount is insufficient to fund the total cash amount due on closing.

33. In order to ensure there are sufficient funds to close the Drilling Transaction, the Debtors and the Drilling Purchaser, in consultation with the Monitor and with the consent of the DIP Lender, agreed to sell certain of the Debtors' surplus equipment (the "Equipment") not needed by the Drilling Purchaser to operate the Drilling Business going forward.

34.     The Debtors and the Drilling Purchaser have had advanced discussions and intend to enter into bills of sale (the "Bills of Sale") of the Equipment with four parties (the "Equipment Purchasers"). The listing of Equipment authorized to be sold to each Equipment Purchaser and the Bills of Sale are attached to the Zweig Declaration at Exhibit B.

35.     The Bills of Sale are each in the same form and contain the following key terms:

(a)     the purchase price owing thereunder is to be paid by the Equipment Purchaser to the Monitor within two business days of the date of the agreement;

(b)     the Equipment sales contemplated by the Bill of Sale is conditional on the Drilling Transaction being approved and in a position to close, subject only to the Equipment sales closing; and

(c)     the Debtors will seek the Equipment Sale AVO to vest the Debtors' right, title, and interest in and to the Equipment in the Equipment Purchaser free and clear of all encumbrances (and provides that any such encumbrances will attach to the proceeds of such sales).

36.     Absent recognition and enforcement by this Court of the Equipment Sale AVO, the Drilling Purchase Agreement cannot close and the Drilling Transaction cannot be completed. As noted above, the Drilling Transaction is a value-maximizing, going-concern transaction. Given the conditions described above, in the event the Drilling Transaction is not approved or otherwise does not close (which the Debtors hope will not be the case), any funds already deposited with the Monitor will be returned to the Equipment Purchasers and the Equipment may be sold as part of a value-maximizing liquidation. The Equipment Sale AVO is supported by the Monitor and the DIP Lender.

**E.     Application to Canadian Court for Approval of the Vesting Orders.**

37.     On October 6, 2025, the Debtors filed a motion (the "Canadian Motion") with the Canadian Court seeking, *inter alia*, approval and entry of the Vesting Orders. A hearing to consider

the motion in the Canadian Proceedings is scheduled for October 15, 2025. Parties in interest were properly noticed in the Canadian Proceedings with respect thereto and will be provided an opportunity to be heard at such hearing.

38.     Each Vesting Order specifically requests the aid and recognition of any court, tribunal, regulatory, or administrative body having jurisdiction in Canada or in the United States to give effect to the relevant order.[8]

## Relief Requested

39.     By this Motion, the Foreign Representative seeks entry of the Proposed Order, pursuant to sections 105(a), 363, 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1(b):  (i) recognizing and enforcing the Vesting Orders; (b) approving the sale free and clear of all liens, claims, and encumbrances, of all of the Debtors' right, title, and interest in the United States assets subject to the Drilling Purchase Agreement (including the transfer of the Subscribed Shares) and the Bills of Sale; and (c) granting related relief.

## Basis for Relief

**A.     The Court Should Recognize and Enforce the Vesting Orders and Authorize the Debtors' Sale of Assets.**

40.     Upon a bankruptcy court's granting recognition of a foreign representative and of a foreign proceeding as a foreign main proceeding, relief is available to the petitioner under section 1520 of the Bankruptcy Code.[9]  Section 1520(a)(2) of the Bankruptcy Code provides, in relevant

---

[8] *See* Reverse Vesting Order § 25 and Equipment Sale AVO  § 10.
[9] *See* 11 U.S.C. § 1520.

part, that, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . section[] 363 [of the Bankruptcy Code] appl[ies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the section[] would apply to property of an estate."[10] Moreover, section 1520(a)(3) of the Bankruptcy Code provides that, upon recognition of a foreign main proceeding, "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section[] 363 [of the Bankruptcy Code]."[11]

41.    Sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and "approval or implementation of agreements concerning the coordination of proceedings."[12] Accordingly, the Debtors respectfully request that the Court recognize and give effect to the Vesting Orders.

42.    Further, section 1507 of the Bankruptcy Code permits the Court to grant the requested relief as "additional assistance."[13] In determining whether to exercise its discretion to grant additional relief under section 1507(a), a court should consider "whether such additional assistance, consistent with the principles of comity, will reasonably assure" the: (1) just treatment of all holders

---

[10] *Id.* § 1520(a)(2).

[11] *Id.* § 1520(a)(3); *see also In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, at *18, 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced under chapter 15); *In re Atrimm, S.r.L.*, 335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) ("[U]nder chapter 15, § 363 (governing sale, use or lease of property of the estate) . . . appl[ies] to any transfer of an interest of the debtor in property within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of a domestic bankruptcy estate.") (citing 11 U.S.C. § 1520(a)(2)).

[12] 11 U.S.C. §§ 1525(a), 1527(4).

[13] *Id.* § 1507; *Ad Hoc Grp. V. Vitro SAB de CV* (*In re Vitro SAB de CV*), 701 F.3d 1031, 1057 (5th Cir. 2012) (explaining that section 1507's "broad grant of assistance is intended to be a 'catch-all'"); *see also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (noting that section 1507 authorizes "additional relief" beyond that available under section 1521 of the Bankruptcy Code) (hereinafter "2005 House Rep.").

of claims against or interests in the debtor's property, (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding, and (3) prevention of preferential or fraudulent dispositions of property of the debtor. Recognition and enforcement of the Vesting Orders is appropriate under section 1507 of the Bankruptcy Code because all applicable factors are satisfied.

43.    Here, recognition of the Vesting Orders is appropriate under section 1507.[14] Courts in the United States have routinely concluded that the CCAA is a sound statutory insolvency scheme that fosters reorganization in a manner consistent with fundamental principles and policies of the United States.[15]

44.    As discussed more fully below in connection with the Releases, section 1506 of the Bankruptcy Code provides that "[n]othing in [chapter 15] prevents the court from refusing to take an action governed by [chapter 15] if the action would be manifestly contrary to the public policy of the United States."[16]  Courts have emphasized that section 1506 of the Bankruptcy Code applies only in very narrow circumstances where the most fundamental policies of the United States are

---

[14]    *First*, the CCAA provides for such a procedure, as previously recognized by numerous United States courts, and a scheme for the "equitable, orderly, and systematic" distribution. *See e.g. Allstate Life Ins. v. Linter Grp.*, 994 F.2d 996, 1000 (2d Cir. 1993). *Second*, the Debtors' creditors and parties in interest have been treated fairly in connection with the Debtors obtaining the Vesting Orders. Such parties have been provided proper and sufficient notice of, and had the opportunity to raise any objections to, the substantive relief requested in the Vesting Orders. *Third*, preferential or fraudulent transfers are not permitted under the CCAA, which provides for the recovery of such transfers.

[15] *See Cornfeld v. Invs. Overseas Servs.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) ("The fact that the foreign country involved is Canada is significant. It is 'well-settled' in New York that the judgments of the Canadian courts are to be given effect under principles of comity. . . . More importantly, Canada is a 'sister common law jurisdiction with procedures akin to our own,' and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (quoting *Clarkson v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976)); *see also In re Grant Forest Prod.*, 440 B.R. 616, 622 (Bankr. D. Del. 2010); *In re Crystallex Int'l Corp.*, 2022 Bankr. LEXIS 3339, 2022 WL 17254660, at *6 (Bankr. D. Del. Nov. 28, 2022).

[16] 11 U.S.C. § 1506.

implicated.[17]   Indeed, "[a] U.S. bankruptcy court is not required to undertake an independent determination about the propriety of individual acts of a foreign court."[18]

45.       Enforcing and giving full effect to the Reverse Vesting Order in the United States is not manifestly contrary to the public policy of the United States; therefore, section 1506 of the Bankruptcy Code does not preclude the enforcement of the Reverse Vesting Order. The process leading to the Drilling Transaction (i.e. the SISP) is similar to that frequently utilized in chapter 11 cases in which sales are preceded by a set of procedures intended to enhance competitive bidding consistent with the goal of maximizing the value received by the bankruptcy estate. Moreover, the Canadian Proceedings complied with fundamental standards of fairness and due process. Notably, recognition of reverse vesting orders under the CCAA, similar to the Reverse Vesting Order, has been granted by bankruptcy courts in numerous chapter 15 cases.[19]

46.       Accordingly, recognition and enforcement of the Vesting Orders is appropriate under section 1507 of the Bankruptcy Code because such relief will provide the Debtors and all parties in interest with certainty that the Vesting Orders will be enforceable not only in Canada, but in the United States, and will therefore protect and prevent prejudice to such parties by ensuring uniform

---

[17] *See In re ABC Learning Ctrs.,* 728 F.3d 301, 309 (3d Cir. 2013); *see Flynn v. Wallace (In re Irish Bank Res. Corp.),* 538 B.R. 692, 698 (D. Del. 2015) (refusing to find a public-policy exception where recognition did not "'impinge severely a U.S. constitutional or statutory right'") (quoting *ABC Learning Ctrs.*, 728 F.3d at 309); *In re Rede Energia S.A.,* 515 B.R. 69, 92 (Bankr. S.D.N.Y. 2014) ("[T]he public policy exception is clearly drafted in narrow terms and the 'few reported cases that have analyzed section 1506 at length recognize that it is to be applied sparingly.'") (quoting *In re Toft*, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011)).

[18] *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010); *see also In re PT Bakrie Telecom Tbk,* 601 B.R. 707, 724 (Bankr. S.D.N.Y. 2019).

[19] *See. e.g., In re Chesswood Grp.*, No. 24-12454 (CTG) (Bankr. D. Del. Mar. 24, 2025); *In re Elevation Gold Mining Corp.*, No. 24-06359 (Bankr. D. Ariz. Dec. 30, 2024); *In re VBI Vaccines (Delaware ) Inc.*, No. 24-11623 (BLS) (Bankr. D. Del. Nov. 20, 2024); *In re Contract Pharm. Ltd*, No. 24-10915 (BLS) (Bankr. D. Del. May 28, 2024); *In re NextPoint Fin. .*, No. 23-10983 (TMH) (Bankr. D. Del., Dec. 11, 2023); *In re Endoceutics Inc.*, No. 22-11641 (Bankr. D. Mass. Oct. 12, 2023); *In re Acerus Pharm. Corp.*, No. 23-10111 (TMH) (Bankr. D. Del., June 13, 2023); *In re Just Energy Grp.*, No. 21-30823 (Bankr. S.D. Tex., Dec. 1, 2022).

application of the Vesting Orders. Moreover, entry of an order of this Court recognizing and giving effect in the United States to the Vesting Orders is an express condition to the Drilling Purchase Agreement.

**B.      The Drilling Purchase Agreement is a Prudent Exercise of the Debtors' Business Judgment.**

47.      Section 363(b)(1) of the Bankruptcy Code authorizes the sale of a debtor's property outside the ordinary course of business if there is a good business reason for doing so.[20] The bankruptcy court has considerable discretion in approving such sale.[21] Once a debtor articulates a good business reason for the sale of estate property outside the ordinary course of business, it is presumed that the debtor's decision to move forward with the sale was made "on an informed basis, in good faith and in the honest belief that the [transaction] was in the best interests of the [debtor] company."[22]

48.      Here, entering into the Drilling Purchase Agreement and consummating the Drilling Transaction is a prudent exercise of the Debtors' business judgment. The Drilling Transaction represent the culmination of the SISP approved by the Canadian Court and conducted by the Monitor, a Canadian Court officer. The process included extensive negotiations and engagement and a thorough, transparent, and fair marketing process pursuant to the SISP. As such, entry into the Drilling Purchase Agreement is a prudent exercise of the Debtors' business judgment.

---

[20] *See* 11 U.S.C. § 363(b)(1)*; Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176-81 (D. Del. 1991) (affirming decision permitting debtor to sell assets where sound business judgment reasons supported the sale).
[21] *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152-53 (D. Del. 1999).
[22] *Official Comm. v. Integrated Res. (In re Integrated Res.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

49. The Foreign Representative believes that the Drilling Transactions represent the best realization of value for the Debtors' stakeholders under the circumstances. In fact, the Drilling Transaction, including the Equipment sales, is the only viable going-concern transaction available to the Debtors for the Drilling Business. Absent the relief requested herein, the Debtors, their creditors, and their employees will potentially suffer significant, if not irreparable, harm due to an inability to close the Drilling Transaction. Accordingly, the Foreign Representative hereby seeks recognition of the Vesting Orders in these Chapter 15 Cases.

## C. The Court Should Afford the Purchasers All Protections Under Subsections 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser

50. The Foreign Representative also requests that the Drilling Purchaser receive the protections set forth in subsections 363(m) and (n) of the Bankruptcy Code. Specifically, section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

51. While the Bankruptcy Code does not define "good faith," courts have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"[23] Courts have held that to demonstrate a lack of good faith, a party would have to show "'fraud or collusion between the

---

[23] *In re Abbots Dairies of Pa.*, 788 F.2d. 143, 147 (3d Cir. 1986).

purchaser and [seller], or an attempt to take grossly unfair advantage [of other potential purchasers.]'"[24]

52.     The Drilling Purchase Agreement is the result of an extensive marketing process undertaken by the Monitor in accordance with the SISP and are the product of arm's length, good-faith negotiations between the parties thereto, with each party represented by independent counsel and advisors. The Debtors also did not enter into the Drilling Purchase Agreement for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia. To the Foreign Representative's knowledge, no party has engaged in any conduct that would cause or permit the Drilling Purchase Agreement to be set aside under section 363(n) of the Bankruptcy Code.

53.     Accordingly, the Foreign Representative seeks a finding that 273 is a good-faith purchasers under section 363(m) of the Bankruptcy Code and have not violated section 363(n) of the Bankruptcy Code.

**D.      Creditors and Parties in Interest Received Adequate Notice.**

54.     In addition to the proposed Vesting Orders posted on the Monitor's website maintained in connection with the Canadian Proceedings, creditors and parties in interest were served with the motion seeking entry of the Vesting Orders in accordance with the procedures approved by the Canadian Court and will have an opportunity to appear and be heard before the Canadian Court.

---

[24] *Id*. (quoting *In re Rock Indus. Mach*., 572 F.2d 1195, 1198 (7th Cir. 1978)).

55.     The Foreign Representative intends to serve this Motion and, to the extent different than the proposed Vesting Orders, the as-entered Vesting Orders entered by the Canadian Court upon the Core Notice Parties as defined in the *Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* [Docket No. 21] (the "Scheduling Order").  The Foreign Representative also intends to serve this Motion on (i) all counterparties to the Debtors' executory contracts and unexpired leases who are (x) located in the United States and/or (y) doing business with a United States Debtor, and (ii) all U.S. governmental licensing entities.  The Foreign Representative also intends to serve a notice of sale recognition hearing before this Court (the "Sale Recognition Hearing Notice") upon the Master Service List (as defined in the Scheduling Order), which encompasses all of the Debtors' known and potential creditors in the United States and other parties in interest.

56.     The Sale Recognition Hearing Notice will (a) set forth the time for filing objections to the relief requested in this Motion; (b) the date, time, and place to attend a hearing on this Motion; and (c) notify parties that copies of this Motion, including the Proposed Order, the Vesting Orders, and the Drilling Purchase Agreement are available and may be examined (i) free of charge at the webpage maintained by the Monitor at www.pwc.com/ca/stsrenewables, or (ii) downloaded for a fee from the Court's electronic docket at https://ecf.deb.uscourts.gov.  As such, this Motion and notice thereof will provide notice that is "'reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding.'"[25]  This notice comes in addition to the notice provided in the Canadian Proceedings in connection with the filing of the motion seeking entry of

---

[25] *In re Energy Future Holdings Corp.*, 522 B.R. 520, 529 (Bankr. D. Del. 2015) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15 (1950)).

the Vesting Orders. Accordingly, the Foreign Representative submits that notice of the Vesting Orders, the Drilling Purchase Agreement, the Drilling Transaction, the Equipment AVO, and the hearing on approval thereof is sufficient and appropriate.

**E.     The Purchase Price for the Drilling Transaction is Fair and Reasonable.**

57.     The Purchase Price provided in the Drilling Purchase Agreement is fair, reasonable, the result of an extensive marketing process and negotiations among the Debtors and their advisors, the Monitor and its advisors, and the purchasers and their advisors, and provides the highest and best value to the Debtors and their stakeholders. The fairness and reasonableness of the consideration to be received by the Debtors is validated by a "market test" through the robust Canadian Court-approved SISP—a reliable means for establishing whether a purchase price is fair and reasonable.[26] The Drilling Transaction presents the best and only opportunities to maximize the value of the Debtors' Drilling Business. For all of the foregoing reasons, the Debtors have determined that the Drilling Purchase Agreement and Drilling Transaction is in the best interests of their estates, creditors, and other parties in interest.

**F.     The Releases Are Appropriately Recognized Under Chapter 15 and the Bankruptcy Code.**

58.     The Releases, as approved by the Canadian Court, cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence in respect of the Drilling Transaction, or the Debtors, their assets, business or affairs, or administration of the

---

[26] *See Official Comm. v. Credit Suisse (In re Champion Ent.)*, 2012 Bankr. LEXIS 4009, at * 93-94, 2012 WL 3778872, at *35 (Bankr. D. Del. Aug. 30, 2012) ("A market test is the best evidence of a company's value at a given point in time.").

Debtors, subject to certain limited exceptions. They do not, however, release claims arising out of fraud, bad faith, illegal acts, or claims that are not permitted to be released under Canadian law.

59.     The Foreign Representative similarly seeks recognition and enforcement of such releases by this Court as granted by the Canadian Court. The Releases are justified, reasonable, and appropriate in the circumstances, particularly because some the Released Parties have been, and some will continue to remain, instrumental to the Drilling Transaction and, more generally, to the Debtors' on-going restructuring efforts in Canada. Further, the Releases will ultimately have the effect of diminishing claims against the Released Parties, which in turn will diminish any indemnification claims by the Released Parties against the Debtors that are secured by the D&O Charge approved by the Canadian Court in the Amended Initial CCAA Order, which ultimately benefits the Debtors and their stakeholders.

60.     Each of the Released Parties has participated, contributed, and/or supported the Debtors' restructuring efforts both prior to and/or after the commencement of the Canadian Proceedings. More specifically:

   a.          including prior to the commencement of the Canadian Proceedings, the Released Parties have worked tirelessly with the Debtors and their principal stakeholders with a view to secure one or more restructuring transactions that would allow the maximization of creditor recovery, the pursuit of the Debtors' business and operations as a going concern, and, ultimately, the preservation of jobs for a substantial portion of the Debtors' employees;

   b.          the Released Parties were instrumental in the Debtors' ongoing restructuring efforts, which include, *inter alia*:

       i.     negotiations with the DIP Lender,
       ii.    conduct of the pre-filing sale process,
       iii.   commencement and conduct of the Canadian Proceedings, and
       iv.    conduct of the SISP.

c.        these restructuring efforts, implemented with the participation, contribution and/or support of the Released Parties, have ultimately and recently led to the execution of the Drilling Purchase Agreement;

d.        the Released Parties have contributed time, energy, and resources to achieve this outcome and such time, energy, and resources will continue to be important to implementing the Drilling Transaction.

61.    The Foreign Representative submits that the Releases, as approved by the Canadian Court, are fair and reasonable, appropriately tailored to the circumstances, are not overly broad, and are in line with releases granted in the context of similar transactions approved in proceedings under the CCAA.

62.    The Foreign Representative is fully cognizant of the Supreme Court's ruling in in *Harrington v. Purdue Pharma L.P.,*[27] which narrowly held that nonconsensual third-party releases in a chapter 11 plan were not authorized pursuant to section 1123 of the Bankruptcy Code.[28] For the reasons discussed below, the *Purdue* ruling does not prohibit this Court—whether pursuant to section 1506's public policy exception or otherwise—from recognizing and giving effect in the U.S. to a Reverse Vesting Order containing the Releases.

63.    By its own terms, the Supreme Court's holding in *Purdue* was limited to the narrow question presented there and is inapplicable to the issue of whether this Court should recognize the Releases in the Canadian Court's Reverse Vesting Order in the context of a chapter 15 case. The *Purdue* Court ruled, based on statutory interpretation of section 1123 of the Bankruptcy Code and not based on public policy, that nonconsensual third-party releases in chapter 11 plans are not

---

[27] 603 U.S. 204 (2004) ("*Purdue*").
[28] *Id.* at 226-27.

authorized under the Bankruptcy Code.[29] The Supreme Court expressly addressed the limited scope of its holding:

> As important as the question we decide today are ones we do not . . . Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.[30]

Given that limited scope, *Purdue* has no application to any aspect of chapter 15 proceedings or to the recognition in the U.S. of a foreign court's orders. On this rationale alone, *Purdue* does not impact recognition of the Reverse Vesting Order containing the Releases.

64.     The *Purdue* Court's narrow tailoring of its ruling makes sense in light of the underpinnings of the holding. The *Purdue* decision was based on the statutory construction of section 1123(b)(6) of the Bankruptcy Code (including the context and history of such provision), not on any broader holding that non-consensual third-party releases are manifestly contrary to the public policy of the United States. *Id.* at 215–24. In fact, the Supreme Court explicitly disregarded public policy arguments:

> Both sides of this policy debate may have their points. But, in the end, *we are the wrong audience for them*. As the people's elected representatives, Members of Congress enjoy the power, consistent with the Constitution, to make policy judgments about the proper scope of a bankruptcy discharge. Someday, Congress may choose to add to the bankruptcy code special rules for opioid-related bankruptcies as it has for asbestos-related cases. Or it may choose not to do so. Either way, if a policy decision like that is to be made, it is for Congress to make.[31]

---

[29] *Id.*
[30] *Id.* at 226-27.
[31] *Id.* at 226 (emphasis added).

65.     This is especially significant in light of the fact that section 1506 is sparingly applied by courts. Section 1506 "requires a narrow reading" and "does not create an exception for any action under Chapter 15 that may conflict with public policy, but only an action that is '*manifestly* contrary.'"[32]     The public-policy exception in section 1506 ought to be invoked by courts only "'where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections' or where recognition 'would impinge severely a U.S. constitutional or statutory right.'"[33] Accordingly, merely because certain relief would not be available under the Bankruptcy Code, does not make that relief "manifestly" contrary to U.S. public policy or within the ambit of section 1506.[34]     For these reasons, *Purdue* does not render the Releases manifestly contrary to public policy under section 1506.

66.     Because the Releases are not manifestly contrary to U.S. public policy, principles of comity favor recognizing the Releases to the extent granted by the Canadian Court. Section 1501's statement regarding the purpose of Chapter 15 "highlights that the Court should be guided by the main policy goals of chapter 15—cooperation and comity with foreign courts and deference to those courts within the confines established by chapter 15."[35]     Here, if the Releases are granted by the

---

[32] *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 139 (2d Cir. 2013).

[33] *ABC Learning Ctrs.*, 728 F.3d at 309 (quoting *In re Qimonda AG Bankr. Litig.*, 433 B.R. 537, 570 (E.D. Va. 2010)); *accord, Fairfield Sentry*, 714 F.3d at 139 (ruling that section 1506 applies only to actions that offend "'*the most fundamental policies of the United States*'" and is "invoked only 'under exceptional circumstances concerning matters of fundamental importance [to the United States].'") (quoting 2005 House Rep. at 109; *Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvenc*y ¶ 89); *In re Crédito Real, S.A.B. de C.V., SOFOM E.N.R.*, 670 B.R. 150, 162 (Bankr. D. Del. 2025) ("Refusing to take an action under Bankruptcy Code section 1506 is an extraordinary act. That section should be 'narrowly interpreted, as the word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States.' As a consequence, that authority rarely is exercised.") (quoting 2005 House Report; collecting cases discussing the narrow construction of section 1506).

[34] *See, e.g., id.* 162-63 ("Relief that is granted in a foreign proceeding does not have to be identical to relief that might be available in a U.S. proceeding."); *In re Qimonda*, 433 B.R. at 570 ("The mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception.").

[35] *Crédito Real,* 670 B.R. at 161.

Canadian Court but not given full force and effect in the United States, U.S. creditors would have an advantage over Canadian creditors with respect to any claims against the Released Parties, undermining the relief the Canadian Court would be granting in the Reverse Vesting Order. Under principles of international comity, the Court should recognize the Releases to the extent approved by the Canadian Court.

67.     In *Crédito Real*, the United States Bankruptcy Court for the District of Delaware recognized and enforced in the United States a Mexican plan of reorganization containing nonconsensual third-party releases.[36] In granting recognition, the court explained why the Supreme Court's ruling in *Purdue* did not prohibit the bankruptcy court from recognizing a foreign plan's nonconsensual third-party releases pursuant to sections 1521(a)(7) and 1507(a) of the Bankruptcy Code.[37]

68.     The *Crédito Real* court's ruling first addressed the argument that the "catchall" provisions of sections 1521(a)(7) and 1507(a) should be interpreted the same way that the *Purdue* Court interpreted the catchall of section 1123(b)(6). Judge Horan rejected this analogy based on the differing statutory constructions of the Bankruptcy Code sections. In comparing section 1521(a)(7) against section 1123(b)(6), through the lens of *Purdue*, Judge Horan explained:

> [I]n section 1123(b), rather than provide specific prohibited relief, Congress directs courts to look to the whole of the Bankruptcy Code to determine if the requested provision is consistent with it. In Purdue, the Supreme Court framed this section as one that "set[s] out a detailed list of powers, followed by a catchall." It explained, "Congress could have said in [section 1123(b)](6) that 'everything not expressly prohibited is permitted[]'"but instead limited it to "any other

---

[36] *See generally id.*

[37] *See generally id; see also* Order Recognizing and Enforcing the Ancillary Order*, In re Nexii Building Sol.*, No. 24-10026 (JKS) (Bankr. D. Del. July 22, 2024), ECF No. 66 (granting, on an uncontested basis, recognition of an "Ancillary Order" in a CCAA proceeding that included certain third-party releases after considering briefing by the foreign representative that affirmatively raised and addressed why such relief is permissible even in light of *Purdue*).

appropriate provision not inconsistent with the applicable provisions of this title." In comparison, in section 1521(a)(7), Congress did expressly enumerate what it wanted to prohibit; in a chapter 15 case, a court cannot grant relief under sections 522, 544, 545, 547, 548, 550, and 724(a). By specifically enumerating relief that the court cannot grant under section 1521, Congress more concretely defined the outer bounds of what the court can grant, thus also more concretely defining what is included in what the court can grant, bearing in mind the guiding principles of comity and cooperation.[38]

69.    Simply put, "[b]y establishing a list of relief that courts should not grant under section 1521(a)(7), the section implies that other forms of relief not expressly prohibited are permitted. Therefore, enforcing foreign orders providing for nonconsensual third-party releases is within the scope of authority that section 1521(a) provides."[39]

70.    Likewise, regarding section 1507, the court in *Crédito Real* observed that section 1507 has express limitations to the power it grants, requiring a court to look to the remainder of "this chapter" (i.e., chapter 15) for such limits.[40] This differs from section 1123(b) in two key respects. First, section 1507 "differs from section 1123(b)(6)'s instruction to look at subsections (1)–(5) to contextualize appropriate relief because chapter 15 covers a broader array of topics than section 1123(b)(1)–(5), which is limited to matters concerning and connected to the debtor."[41] Second, while section 1123(b)(6) prohibits relief inconsistent with applicable provisions of "this title" (*i.e.,* the Bankruptcy Code), section 1507 references chapter 15 specifically, which has as its purpose the promotion of comity and international cooperation.[42] "Accordingly, relief that is appropriate subject to limitations in chapter 15 must be different than relief that is not inconsistent with the applicable

---

[38] *Id*. at 167-68 (quoting *Purdue*, 603 U.S. at 218).
[39] *Id*. at 168.
[40] *Id*.
[41] *Id*.
[42] *See id*.

provisions of the Bankruptcy Code."[43] Moreover, Judge Horan observed that section 1507(b) explicitly provides a list of factors for a court to consider, when analyzing whether to provide "additional assistance." Thus "section 1507 . . . differs from section 1123(b) because section 1123(b) does not expressly establish specific boundaries; instead, it directs courts to look to the rest of the Bankruptcy Code to determine whether a provision is appropriate."[44]

71. Judge Horan also rejected the argument that recognizing the Mexican plan's releases were manifestly contrary to U.S. policy, noting that section 1506's public-policy exception is to be narrowly applied.[45] The court observed that nonconsensual third-party releases are explicitly provided for in asbestos cases under section 524(g).[46] Moreover, the Court emphasized that the *Purdue* Court explicitly ruled that Congress had not, but *could*, authorize nonconsensual third-party releases in Chapter 11—if this would infringe on a constitutional right, the Supreme Court would not have suggested Congress could allow it.[47] In sum "[l]ack of specific availability in U.S. courts does not equate to manifest contrariness to U.S. public policy, especially where, as here, the contested relief is available in other contexts and could be made available more broadly by a simple act of Congress."[48] *Id.*

72. The *Crédito Real* court's reasoning applies with equal force here. Just as the enforcement of the third-party releases in the plan in *Crédito Real* was within the ambit of relief available under section 1521(a) and 1507(a), the enforcement of the Releases here is permissible

---

[43] *Id.*
[44] *Id.* at 169.
[45] *Id.* at 163.
[46] *Id.* at 174.
[47] *Id.* at 173.
[48] *Id.* at 173-74.

under those sections and not prohibited by *Purdue*. Specifically in connection with section 1507(a), recognition of the Releases is in line with the considerations set forth in section 1507(b). Recognizing the Releases ensures just treatment of all claimholders across borders; failing to recognizing the Releases would give creditors in the U.S. an advantage over Canadian creditors. Placing all creditors on equal footing does not prejudice U.S. creditors, lead to preferential or fraudulent dispositions of the Debtors' property, or otherwise impede a fair distribution of assets of the Debtors or proceeds of the SISP. Likewise, for the reasons argued above, recognition of the Releases is not manifestly contrary to U.S. public policy.

73.     Accordingly, the Vesting Orders and the Releases granted therein should appropriately be recognized by this Court.

## G.     The Cancellation of Interests Through the Reverse Vesting Order Is Appropriate and Permissible Under Chapter 15.

74.     The Reverse Vesting Order terminates and cancels all existing shares, as well as any agreement, contract, plan, indenture, deed, certificate, subscription right, conversion right, preemptive right, option (including stock options or share purchase or equivalent plans), or other document or instrument governing or having been created or granted in connection with the share capital of STS USA and Earth Drilling.

75.     The cancellation of all outstanding shares and the issuance of new shares to the Drilling Purchaser pursuant to the Reverse Vesting Order is within the jurisdiction of the Canadian Court.[49]

---

[49] *See, e.g.*, *Harte Gold (Re)*, [2022] OJ No. 650, 2022 ONSC 653 ¶ 64 (finding that where "shareholders have no economic interest, present or future, it would be unnecessary and, indeed, inappropriate to require a vote of the shareholders" to effectuate an action achievable through the court).

76. Here, the Canadian Court has approved and permitted the cancellation of the shares through the Reverse Vesting Order and recognition of that order directly serves the purpose of chapter 15—affording comity to a foreign Canadian court order.

77. This Court has previously approved reverse vesting order transactions, finding similar relief to be necessary and appropriate, in the interest of the public, and to be consistent with the public policies of the United States.[50]

## **Notice**

78. The Foreign Representative will serve this Motion by electronic mail and/or domestic or foreign mail upon (i) the U.S. Trustee, (ii) the Core Notice Parties, (iii) all counterparties to the Debtors' executory contracts and unexpired leases who are (x) located in the United States and/or (y) doing business with a United States Debtor, and (iv) all parties who have requested notice in these Chapter 15 Cases pursuant to Bankruptcy Rule 2002. The Foreign Representative will serve the Sale Recognition Hearing Notice by electronic mail and/or domestic or foreign mail upon the Master Service List.

## **No Prior Request**

79. No previous request for the relief requested herein has been made to this Court or any other court.

## **Waiver of Bankruptcy Rule 6004**

80. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders

---

[50] *See, e.g.*, *In re Acerus Pharma. Corp.*, No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023); *In re Nextpoint Fin.*, No. 23-10983 (TMH) (Bankr. D. Del. Dec. 11, 2023).

otherwise."[51] The Foreign Representative respectfully submits that cause exists to waive the 14-day stay under Bankruptcy Rule 6004(h). Waiving the 14-day stay will not prejudice the Debtors or any party in interest because parties will have notice and an opportunity to be heard in both the Canadian Court and this Court. Further, the outside closing date under the Drilling Purchase Agreement is October 31, 2025. The 14-day stay should be waived to permit the Foreign Representative and the Debtors to take actions that they determine are reasonably necessary to consummate the transactions within the required time frame. Accordingly, the Foreign Representative requests that the Court waive the 14-day stay provided for in Bankruptcy Rule 6004(h).

WHEREFORE the Foreign Representative respectfully requests that this Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: October 9, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Steven W. Golden*
Steven W. Golden (DE Bar No. 6807)
Mary F. Caloway (DE Bar No. 3059)
Brooke E. Wilson (*admitted pro hac vice*)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Tel: 302-652-4100
Fax: 302-652-4400
sgolden@pszjlaw.com
mcaloway@pszjlaw.com
bwilson@pszjlaw.com

*Attorneys for Foreign Representative*

---

[51] Fed. R. Bankr. P. 6004(h).